Good morning. May it please the Court, my name is Demetris Hampson and I represent the United States. I would ask to please reserve two minutes for rebuttal. Your Honor, this case involves a 28-year-old victim with severe cerebral palsy. The evidence at trial showed that she couldn't walk, she couldn't talk, she had never had any sexual experiences before August 3, 2011. How do you know that? Your Honor, there was testimony from the nurse who testified during the trial that when she obtained a history, she learned that the victim had never had sex before. She also had fresh tearing and bleeding when she was penetrated on that day. Well, how could she get a history? She said she couldn't communicate with her. That's right. She obtained a history from the family members, but the family members... How do they know for sure? The family members that testified at trial indicated that she had not been around boys, she had not had those opportunities, they had never seen her even interact with boys, let alone kiss or be intimate. She had to be cared for 24 hours a day. She was never left alone. She never would have even had an opportunity to have sex with somebody. So the only contested issue in this... 29 years is a long time. I'm sorry? She obviously was alone with the defendant. You know, they happened to have walked in on it, so obviously there were times when she wasn't supervised. So, I mean, you made a sort of statement that she's... And that was the evidence at trial. The evidence at trial was that she had not been around boys, that she had not had sexual experiences before. But the point is that the only contested issue at this trial was whether this victim was physically incapable of declining participation in or communicating an unwillingness to engage in those sexual acts. We have to assume that she's of a normal mental capacity. That evidence is not before the court today. Well, it's not, but since you didn't charge her with mental... That's another... That's 2A, right? Correct. Mental inability, we have to assume she's basically like, you know, us, where she has the same mental capacity as a normal person. And the only question is, is she having, if she decided to not participate, does she have the physical ability to communicate that, right? Your Honor, respectfully, I don't think that we have to concede that she had a normal mental capacity. I agree with you that it's not relevant in this case, whether she had a normal mental capacity or not. Well, we have to make some assumption about her mental capacity. We cannot base any part of the ruling on a lack of capacity to understand or make judgments. The only thing we are looking at is the ability to communicate the judgment made. We have to make some assumption about the judgment itself, and we have to assume that the judgment was a normal judgment made by a normal person with normal mental abilities. It's never... That's correct. It's not relevant, so we have to make that assumption. So it's just like anybody else in the courtroom today, you, me, you know, anybody. The question is we can process it. We can make a decision. We can make a judgment. The question is, did she have the physical ability to communicate? No. That's correct, and that's always been our position. Our argument has always been that she physically was incapable of communicating to the defendant. What evidence is there supporting the notion that she did not have the physical ability to communicate? Your Honor, viewing the evidence in the light most favorable to holding the jury's verdict, there is more than sufficient evidence. We could go through... I don't want a characterization of sufficiency. I'm really talking about specific evidence. So... We'll figure out whether it's sufficient. So just tell us what there is. So there's two things that I want to say about that. We can talk about what the... How about first telling me the evidence, and then you can say anything you want about it. Right. So the witnesses who testified at the trial, the caregiver who cared for the victim on a daily basis for eight and a half years indicated in her testimony that she could not always communicate with the victim. She indicated that the victim could not always tell her what she wanted or didn't want. She said that she could not always communicate when something didn't make her happy. She talked about her lack of muscle control. She talked about her involuntary movements. She said that she couldn't always understand what the victim needed, wanted, desired, or didn't like. And in large part, that was due to her physical movements or her lack of control, her lack of ability to talk. Her gestures, her facial expressions were not always consistent with... I thought there was evidence that she could communicate when she didn't like a television program. She could say no. We have the tape, too, right? Correct. Where she's perfectly capable of saying no, and she does say no to certain questions and yes to certain questions. Looked to me like she was saying no when she meant no. Your Honor... Of course, I don't know what's in her mind, whether the no relates to what she's really thinking, but she looked like she could communicate no. Your Honor, and again, this goes back to the sufficiency standard. For every piece of evidence, like Mark Quay, you mentioned about changing the channel and she would make a noise, she made a growl when somebody changed the channel. He assumed that meant that she didn't want him to change the channel. He also said that that was a low, it was a noise, it wasn't very loud, and that people who didn't spend every day with her or didn't know her very well wouldn't know what that growl meant. She didn't have a method by which to communicate to someone. That's an interesting question. So does the ability to communicate have to be something that's understood by everybody? I mean, you say it couldn't be understood by some people. I'm just wondering, when we talk about physical ability to communicate, whether that requires something, a method of communication that's understandable by absolutely everyone. Well, I believe the statute requires that she be able to communicate to the defendant, but I think the plain meaning of communication... I'm sorry, does it? ...says that the victim has to be physically incapable of declining participation or communicating unwillingness in that sexual act. Well, let me ask you something along the communicating lines. I'm puzzled. In your reply brief, each of the arguments, A, B, and C, under Part 4, it talks about communications. But yet, when you look at 2242, and I'm not a stranger to these kind of cases. We have nine Indian reservations in South Dakota with a lot of Indian cases. But 2242, 2B, which you charged under, says physically incapable of declining participation in or communicating unwillingness to engage in that sexual act. The or, of course, the defense argued DeMorgan's theorem with regard to saying it's in the conjunctive. I don't read it that way. It's a context question instead. So physically incapable of declining participation in, if she's physically incapable of declining participation in, and your Exhibit 17 would tend to show that, Exhibit 20, 120, would tend to show to the contrary, jury question. So why are you talking about in your brief all about the communicating when it seems to me the conviction possibly could be sustained because she's physically incapable of declining participation in? You're looking at physically. You're not looking at communication. What am I missing? Your Honor, I think that it's a good question. I don't ‑‑ I believe that this statute is fairly clear. And I will tell you that the theory we proceeded on at trial is that we had to prove both. I mean, in fairness, we proceeded on the theory that we had to prove that she couldn't physically decline and that she couldn't communicate. That now physical modifies the declining participation as well as the communication. If you have to prove both, you're in trouble because it seems. But if you read it in the disjunctive, you're home free. I agree with you. And I respectfully disagree that we're in trouble if the ‑‑ if we have to prove both. Well, I'm not saying you're dead, but you're in trouble. Your Honor, really, this goes ‑‑ and you just brought up this point. This was a genuinely disputed fact at trial. For every Mark Quay who said that there was a growl, there were witnesses who said I couldn't communicate with her at all. We know, and I would like to reserve some time for rebuttal, so I'll wrap this up unless there are any additional questions. But we know from the defendant's own statements that was introduced in the case in chief, he said she couldn't talk. She couldn't get out of her wheelchair by herself. He had to take her pants and her underwear off. He said it wasn't like having sex because she was just laying there. That's very convincing evidence for a jury to reasonably conclude that if she had been willing ‑‑ if she had been able to communicate to him that she didn't want to have sex with him, she would have done so. So, Ms. Sampson, why didn't you charge A and B? Your Honor, B seemed to fit this victim best. Argument you were just making is an A argument, that she lay there like a rag doll without any outward manifestation that she had any awareness of what was happening. Not necessarily, Your Honor. This is a physical inability because of her disability to be able to react, to be able to decline, to be able to communicate. And it goes on in her physical examination with the nurse when she's touching this area of her body that's just been severely injured and she's not reacting at all. She's not talking. She's not saying anything. But if you're ‑‑ if you go to the doctor and you understand what's going on, and the doctor or the nurse examining you, it may be uncomfortable and unpleasant, but you don't object because you understand what's going on. And, again, we have to sort of presume that she understands what's going on. Right. And what reason does she have to object to the nurse touching her? It's not ‑‑ You know, people don't ‑‑ you know, when we go to the doctor, you know, sometimes they do things we don't like. Correct. But we don't object. You know, they do surgery. They can do ‑‑ well, never mind. You know what I'm talking about. I do know what you're talking about, Your Honor. And my point is ‑‑ yes, I think we'd all like to object to some things that happen. Yeah, we want to object, but we don't because we know, you know, we understand. Again, this implicates the A versus the B. Don't we have to presume that she, with the nurse, she understood what was going on, and though she might have found it objectionable, you know, the way we sometimes find medical examinations objectionable, she doesn't object because she knows this is for her own good. So I'm not sure what inference you can draw from that. I'm talking more about her physical reaction. I think you can draw inference from all of the witnesses who were not able, even just her ‑‑ the beginning of her examination where she tried to talk to her, where she tried to ask her yes or no questions. I'm not talking about her mental capacity. I'm talking about her physical ability, which we saw on the video. Sometimes she couldn't answer questions at all. Sometimes you could tell she was trying to answer questions, but she couldn't. Or she'd answer them incorrectly. Or because of her involuntary movement, it was ‑‑ Well, say you incorrectly. I mean, you know, it's her answers. You have to sort of get into her mind, and if she's answering them incorrectly, you're, again, challenging her ability to think or judge. But we have to assume that, you know, when she says yes, she means yes. And when she says ‑‑ I mean, she seemed to ‑‑ she was asked questions about having boyfriends, and she, you know, said yes, yes. And then there was a question about girlfriends, and the grandmother says, you know, she doesn't like girls so much because the girls pick on her. And, you know, she seems to be reacting. It's perfectly clear what she was saying when she was saying yes. And sometimes she would say no. I don't ‑‑ I mean, she didn't use standard English. But, Your Honor, if we take your argument, these were all in response to questions. If we take your argument for vase value that she could always, and it's not my position to judge whether she could say yes or no or answer correctly or incorrectly, if we take that at its face value, that would require that the defendant ask her for permission to have sex with him. And that's not what the statute requires. There was no evidence in the record that she would have been able to stop him physically, that she would have been able to tell him stop. The question is whether she has the capacity to say no. To the sexual act. There is no consent. There is no consent required in the statute, one way or the other. It's all a question of capacity to communicate, right? So that's all ‑‑ it doesn't require asking of an answer. It asks whether she is capable of declining or communicating no if her ‑‑ if she thinks no, if her decision internally is no. Now, we have a district judge who watched the trial and a very experienced district judge who made this ruling, who watched the entire proceeding. Is he entitled to deference on any of that? The judge? Uh-huh. Your Honor, no. I think that this is ‑‑ this is a sufficiency of the evidence standard. I think ‑‑ I respectfully think the district court judge misapplied the standard. I think he plucked out in his order any evidence that could have supported a finding of not guilty and completely ignored all of the evidence in the record that talked about her inability to communicate. And just to be clear, to communicate an unwillingness to engage in sex, being able to nod your head no in response to a question about, you know, your cat or your favorite color is not the same. And I'm not talking about mental capacity. It's not the same as being able to say no to somebody, to communicate no to somebody engaging in a sexual activity. What evidence does the government present on that score, her ability to say no to sex? Because the individuals who know her ‑‑ What evidence is her ability to communicate? I mean, you want to focus specifically not on her general ability to communicate, but her ability to communicate no to sex. What is there on the records that the government ‑‑ it's the government's burden to prove that, right? Correct. And what did the government show to show that inability? Well, I'll start with Patricia Shands, who worked with her every single day for eight and a half years, who said that she could not always communicate when she didn't like something. She couldn't always ‑‑ That's not ‑‑ that doesn't have anything to do with sex. She didn't specifically talk ‑‑ you want to focus in on whether she can say no to sex. I'm asking you what is in the record that specifically goes to the question whether she can say no to sex. I'm not saying that's all, that the other stuff might not be relevant, but that's what you were putting forward. And so I want to know what in the record speaks to that question. There's no question specifically asked whether she could say no to sex, but these are reasonable inferences that the jury could make, and the jury did make in this case, from the evidence that was presented. And it goes back to the fact that, as far as we know, she has never had sex before, so we don't know what she would do in that situation other than what happened here on August 3, 2011. But the reasonable inferences that the jury could conclude from the evidence that was presented at trial is that she would not have been able to communicate to him on that day that she did not want to have sex. It was a fact question for the jury. It was a genuinely disputed issue. It's not an issue of law. The statute is clear. It's a question for the jury to decide. Thank you. Thank you. We'll hear from the other side. Good morning, Your Honors. My name is Keith Hilzendegger. I'm with the Federal Defender's Office in Phoenix, and I represent the defendant in this case. I'd like to address Judge Pearsall's comments about how to interpret the statute and what exactly the government is required to prove, because that's the backdrop against which the reasonable inferences have to be drawn. The statute requires the government to prove both that the defendant or the victim here is physically incapable of declining participation in and that she's physically incapable of communicating her unwillingness to engage in a sexual act. My friend at the other table said that that was the theory of prosecution because she deemed that interpretation to be fair. My contention is not only is it fair, but because of a rule of logic that I pointed out in my answering brief, that's the plain meaning of the statute. The government has to present, produce evidence in its case in chief here that the victim is unable to decline participation in a sexual act, and the government has to produce evidence in its case in chief that she's unable to communicate her unwillingness to engage in a sexual act. Counsel, what do we do with the evidence that in order to commit the crime, the and by his own admission that she simply lay there during the sexual act as if, I'm not sure he used the word catatonic, but that's how I interpreted the evidence, that there was no reaction from the victim? What you do with the evidence, Your Honor, is you still, a rational jury would still have to speculate from that evidence that she was physically incapable of manifesting her life. But that's pretty strong evidence. I mean, is your position that no reasonable fact finder could determine from that fact alone that she was physically incapable of resisting, let alone appreciating what was happening to her? Yes, Your Honor, it is my position. And I want to – the government argument, it's brief, and I've countered this before, that resistance is not a requirement here. That's one way that a person – But there has to be some – I mean, this is not a case where the victim was incapacitated by alcohol or drugs or was in such deep sleep that she didn't even realize that he was penetrating her. So we're left instead with a – I'm not familiar with the terms of the symptoms of this particular disability, but based on the record, it seems like an awfully debilitating physical illness. I don't – I don't disagree with that characterization. She has to be lifted on and off the toilet. She can't attend to, you know, even basic hygienic needs without having somebody do it for her. But based on those two pieces of evidence that our exchange here started with, Your Honor, it still required the jury to speculate that just because, as the defendant put it, it's not like sex because she was just laying there, that she still didn't – that she nevertheless didn't have the capacity to express to him that he didn't want to do it. I mean, Jody Clay testified – Well, counsel, I looked at those videotapes, and what's really disturbing to me about the video evidence is the investigator couldn't even interview her about the facts of the crime. We have the testimony from the emergency room nurse doing the rape exam, that she couldn't even take a simple history from this woman. All those facts have to be considered in the totality, do they not, when we apply the Jackson standard? They do, Your Honor, but they still have to be judged in their totality against the elements of the statute. And as Judge Kaczynski pointed out, and as the district judge pointed out in his order, the video still reflected that she was capable of saying yes and capable of saying no. But the evidence suggests that not in every case, that sometimes she would say yes when that's not what she meant, or her facial expression was completely the opposite of what it was that she was trying to communicate. Can't the jury consider that as well? The jury has to – the jury can consider that evidence, but it can't consider that evidence for anything other than the physical abilities of the victim. And I understand this is a sad case. It's a very sad case. The victim has severe limitations. But the purpose of the judgment of acquittal is to guard against the occasional case in which a jury returns a guilty verdict based on sympathy or some emotional reaction rather than a rational evaluation of the evidence. But doesn't the law exist to protect those who are too helpless to protect themselves, counsel? Well, but the counter to that, Your Honor, I think is that if this court were to reverse the judgment of acquittal, it would in essence be saying that the victim here is a person for whom it's illegal to have sex with no matter what, even if she wants to. But you would agree that if she were in a coma that the law would protect her? If she were in a coma, the law would protect her, yes, Your Honor. And so the question is, is she closer to being comatose as opposed to – I don't know what the opposite word is, but vibrant? I disagree, Your Honor, that there's a continuum. What the government – Well, there has to be, doesn't there? No. Based on the extent of the physical and mental impairment? Give me a second. I don't want to – Sure. I don't want to convey an improper tone to the court. I – the government took it upon itself to prove a negative. So that's why I say there's not – Well, it has to. The statute requires it to prove a negative, her inability, her incapability to communicate. That's the negative. Right. Proving a negative is different from saying where does this person fit on a statutorily defined continuum. There's not – Well, the thing about the catatonic person is they have no mental capacity to – the catatonic, you fit under B, right? I agree that a person who's catatonic, truly catatonic, would probably – would definitely fit under B, Your Honor. I mean, that's the thing about somebody being catatonic and probably even somebody being asleep, because at that point, at the time that the conduct is commenced, you don't have the mental capacity to appreciate it. Well, you don't have the physical capacity to appreciate it. You might be – you might have the mental capacity if you're asleep, for instance. You have the mental capacity to appreciate what's going on around you. It's just that you're not – I can't even ask a question. I'm sorry, Your Honor. Whether you are talking about general mental capacity or mental capacity at the moment of penetration or the moment that it happens. And I think reading the catatonic and the sleep cases, what they're saying, when the conduct commences, you don't have the ability because you're asleep. You can't appreciate what's going on. I agree. Because you're asleep. Here we have to assume that she has normal mental abilities, right? Yes, we do, Your Honor. Because the government didn't charge her with that. It could have tried to prove that she didn't. And looking at the tapes, I personally wonder whether she does or not. I don't know. But the defendant didn't get a chance to argue that and didn't present evidence on that score, right? Right. You know, as the defense, we don't make charging decisions. We react to whatever charging decisions the government makes. Here the government chose to proceed solely on the – The defense doesn't get to pick its charges? No, Your Honors. So because the government chose not to make an issue out of the victim's mental capacities, you know, I agree that the video depicts someone who also may have some mental incapacities that don't – that affect her ability to actually consent. But, again, that's not an element of the statute. The inferences that the reviewing court draws at the first step of charging.  No, I'm not, Your Honor. The jury, as far as I can tell, was properly charged. Might have confused mental capacity with physical capacity. Right. In its deliberative process, the jury may have confused mental for physical and then decided, well, this is good enough. Or, you know, as Judge Tallman said, you know, his reaction produced a certain – I'm trying not to mischaracterize what you said, Your Honor. You know, Judge Tallman had a certain empathy for the victim and – Well, it's not empathy. It's the protection that the law affords to those who are too defenseless to protect themselves. And the way Congress – And the question is, does she meet the statutory definition by being incapable of appreciating what's happening to her and her inability to say or communicate, no, I don't want this to happen to me? That's the question the jury had to resolve. And why shouldn't we defer to the jury in the face of this kind of evidence? The purpose of the statute, I agree, Your Honor, is to protect a certain class of people. And Congress wrote the statute to define the class of people it wanted to protect in a certain way. And what the jury had to decide is whether the government produced – or the government had proven whether the victim here fell into the class of person as defined by the statute. Do you agree with Judge Tallman's statement that the jury had determined that she could appreciate the conduct? No, I don't, Your Honor, because appreciating is a charge under Section 2A, subsection 2A. You didn't object. I just wasn't sure whether you were just being polite or – You know, mentally you have to sort out – you have to appreciate the questions that are being posed to you. No, I understand. That's why I'm asking the question. I'm not trying to tell you what the answer is. I was just surprised that you didn't object. I just want to make sure what your position is. I'm grateful for the opportunity to clarify a response to Judge Tallman's question. So, in your view, we have to assume, as a given, that she could appreciate and could make that judgment. Yes, Your Honor, I did. Yes. And the only question was, was she physically able to communicate? No. Correct. Under the circumstances. Under the circumstances. Now, opposing counsel says, well, she might have been able to say no. There was evidence that she was able to say no in certain circumstances, but not in others, and particularly not, government counsel argues, as to sexual matters as to which she wasn't experienced. So – What would you say to that? Addressing that particular point, I think that favors affirmance here, because if the only evidence that the jury could rationally consider was evidence that specifically related to her ability to communicate her unwillingness to engage in sex, there was no evidence presented along those lines. And this Court has held that if the government doesn't present evidence to meet its burden of production, the right thing for a trial judge to do is to grant a judgment of acquittal, which is what the judge did here. Well, again, counsel argues that you can draw inferences from some of the witnesses. She mentioned the nurse examination. She mentioned, if I remember correctly, her helper, who said she couldn't always understand what the victim said. She didn't object, the victim didn't object to the nurse examining her. Do you have anything to say? Before I answer, Your Honor, can I clarify? Are we still talking about the narrow limitation on her ability to communicate an unwillingness to engage in sex? That was the question I asked the counsel, because she posed, she said, well, she couldn't communicate on sexual matters. And then I said, well, what was that? And she says there was nothing specific saying sexual, but you can draw inferences from these other things. So I think that's where you are. Right. That's where you are. You heard her answer, and I was just going to give you a chance to respond to it. So I agree with what Your Honor said to my friend at the other table, that if the question is focused narrowly on her ability to talk about sex, there was no testimony from the caregiver along those lines, and testimony from the nurse who did the medical examination isn't relevant, because a rational person who has the ability to appreciate mentally what's going on would not resist a medical exam that's designed to gather evidence of a crime committed against her. And if there are no further questions, I'll ask the Court to affirm the judgment of the District Court. Thank you. Thank you. You're out of time. Would you like a minute for rebuttal? Okay. I appreciate the opportunity. First of all, just respond, I want to respond very quickly to a couple of things my counsel at this table said. I don't think we can assume that the jury was confused by the instructions. I think the instructions were clear, and, in fact, I think our obligation... I think he said as much. Don't waste your minutes. He does not... And at this point, I think unless we are going to require a victim under this statute to be in a catatonic state, which clearly is not something Congress intended, then this is a fact question for the jury. I think we go back to the fact that this is a fact question. There are lots of circumstances in which a victim might not be able to communicate even though they're not catatonic. The best, I think one of the best pieces of evidence is what she actually did under these circumstances, when the defendant was on top of her, when he was putting his finger in her, when he was having sex with her. And I think that her ability to communicate, her lack of ability to communicate is best demonstrated there, in addition to all of the witnesses who had difficulty communicating with her. They were reasonable inferences that the jury could have drawn. Is it possible she was not communicating because she wasn't objecting? Absolutely, that's possible, Your Honor. But I think that the reasonable... But you want to draw the inference from the fact that she said nothing that she must not have been able to communicate. I mean, another inference might be, again, if we sort of assume that mentally she is, you know, of normal mental capacity, that she's not objecting because she has an objection. I mean, that's another inference. Your Honor, respectfully, the question isn't what I want to infer. The question is what can the jury reasonably infer. And the evidence was such that the jury reasonably could have inferred that she didn't communicate because she couldn't communicate. That was a reasonable inference for them to draw, and it's our obligation to uphold their verdict if there was sufficient evidence to sustain that, and here there clearly was. Okay. Thank you. All right. Case is argued. We'll stand submitted. Thank you.
judges: Piersol, Kozinski, Tallman